E-FILED
Friday, 02 August, 2024  09:58:56 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| KRISTIN SCHMITZ and DANIELLE CONNOR, Individually and On Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| CASEY'S GENERAL STORES, INC., SYNQ3 RESTAURANT SOLUTIONS, LLC, and SOUNDHOUND AI, INC. | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Kristin Schmitz and Danielle Connor ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), against Casey's General Stores, Inc. ("Casey's"), SYNQ3 Restaurant Solutions, LLC ("SYNQ3"), and SoundHound AI, Inc. ("SoundHound"), and allege as follows based on personal knowledge as to themselves and on the investigation of counsel.

**NATURE OF THE ACTION**

1.    This lawsuit arises out of Defendants' actions in collecting, capturing, otherwise obtaining, using, and/or storing the biometric identifiers and/or biometric information, including the unique "voiceprints," of Plaintiffs and other similarly situated individuals, without informing them in writing or obtaining their written consent, as required by BIPA.

2.    As the Illinois Legislature has recognized,

> [B]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, even sensitive information such as Social Security numbers can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

*Carpenter v. McDonald's Corp.*, 580 F.Supp 3d 512, 515 (N.D. Ill. 2022) (citing 740 ILCS 14/5; *see also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 619 (7th Cir. 2020) (noting the "threat of irreparable privacy harms, identity theft, and other economic injuries" arising from biometric data).

3.    In light of these privacy concerns, the growing use of biometrics in various contexts, and the fact that "[t]he full ramifications of biometric technology are not fully known," BIPA was enacted to regulate how private entities may collect, use, and/or store individuals' biometric identifiers, including voiceprints, and biometric information. 740 ILCS 14/5.

4.    BIPA, provides, *inter alia*, that no private entity may collect, capture, or otherwise obtain biometric identifiers (including voiceprints) or biometric information without first informing the subject in writing of the fact, purpose, and length of the collection and receiving a written release from the subject. 740 ILCS 14/15(b).  BIPA also prohibits private entities from profiting from the biometric identifiers or information. 740 ILCS 14/15(c).  BIPA further requires that private entities in possession of biometric identifiers or biometric information must develop a publicly-available written policy establishing a schedule for their retention and, importantly, their destruction, within certain statutory time limits. 740 ILCS 14/15(a).

5.    Although BIPA was enacted in 2008, Defendants have been violating the statute by collecting, capturing, otherwise obtaining, using, and/or storing the unique and highly sensitive "voiceprints" of thousands of individuals in Illinois, without their knowledge or consent, through

the use of artificial intelligence ("AI")-assisted voice technology for Casey's customers' telephone orders, developed by Defendant SYNQ3.

6.      Defendants do not have publicly available, written policies containing retention schedules or guidelines for permanently destroying biometric identifiers or biometric information, as required by BIPA.

7.      Plaintiffs bring this action on behalf of all individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored, when making a telephone order at a Casey's location in Illinois at any time within the applicable statute of limitations, to prevent Defendants from further violating Illinois law and to recover damages for Defendants' violations of their and other Class members' statutorily-protected rights to privacy under BIPA.

## THE PARTIES

8.      Plaintiff Danielle Connor is, and has been at all relevant times, a resident and citizen of Rushville, Illinois. In March 2024, Ms. Connor called the Casey's location at 304 W. Clinton Street, Rushville, Illinois, to place an order for food, and interacted with AI-assisted voice technology during that call.

9.      Plaintiff Kristin Schmitz is, and has been at all relevant times, a resident and citizen of Sparta, Illinois. On or about June 3, 2024, Ms. Schmitz called the Casey's location at 710 W. Broadway Street, Sparta, Illinois, to place an order for food, and interacted with AI-assisted voice technology during that call.

10.     Defendant Casey's General Stores, Inc. ("Casey's") is incorporated in Iowa and maintains its principal place of business in Iowa.  Casey's and its direct and indirect wholly-owned subsidiaries operate convenience stores and gas stations primarily under the names "Casey's" and

"Casey's General Store" in 17 states.[1] Casey's also offers groceries, various prepared foods, fresh-made pizza, health and beauty products, automotive products, and other nonfood items, and is the fifth-largest pizza chain in the United States.[2] There are more than 2,600 Casey's stores in the United States.[3] Upon information and belief, there are more than 400 Casey's locations in Illinois.

    11.    Defendant SYNQ3 Restaurant Solutions, LLC ("SYNQ3") is a Nevada limited liability company with its principal place of business in Colorado. SYNQ3 touts itself as the "premier provider for restaurant automation, technology, and off-premises solution" and has "processed billions in restaurant sales for thousands of restaurant locations and dozens of enterprise restaurant brands."[4] SYNQ3's voice AI technology is utilized at thousands of restaurants and stores around the country,[5] including in Illinois.

    12.    Defendant SoundHound AI, Inc. ("SoundHound") is a Delaware corporation with its principal place of business in California. SoundHound describes itself as "the leading innovator of conversational technologies, . . . trusted by top brands around the globe."[6] On December 7, 2023, SoundHound announced a definitive merger agreement to acquire SYNQ3.[7] The transaction

---

[1] Casey's Annual Report on Form 10-K for the Fiscal Year Ended Apr. 30, 2023 (June 23, 2023) ("Casey's                    10-K"),                    *available*                    *at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0000726958/000072695823000059/casy-20230430.htm, at 4; https://www.caseys.com/about-us (last visited July 14, 2024).

[2] Casey's 10-K at 4; https://www.caseys.com/about-us (last visited July 14, 2024).

[3] https://www.caseys.com/about-us (last visited July 14, 2024).

[4] https://synq3.com/about-us/ (last visited July 14, 2024).

[5] https://synq3.com/fast-casual/ (last visited July 24, 2024).

[6] https://www.soundhound.com/about/ (last visited July 24, 2024).

[7]    https://www.soundhound.com/newsroom/press-releases/soundhound-ai-to-acquire-synq3-to-expand-its-ai-customer-service-solutions-and-create-the-largest-voice-ai-provider-for-restaurants/#:~:text=SANTA%20CLARA%2C%20Calif.%2C%20December,solutions%20to%2

closed on January 3, 2024.[8]

## JURISDICTION AND VENUE

13.    This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from at least one Defendant.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (c)(2) because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### I.    Illinois's Biometric Information Privacy Act

15.    Recognizing the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information," the Illinois Legislature enacted BIPA in 2008. Illinois House Transcript, 2008 Reg. Sess. No. 276. BIPA regulates, *inter alia*, "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

16.    Under BIPA, a "biometric identifier" refers to a person's "retina or iris scan, fingerprint, ***voiceprint***, or scan of hand or face geometry." 740 ILCS 14/10 (emphasis added). "In other words, a biometric identifier is a unique personal feature that can be used to identify a

---

0the%20restaurant%20industry.

[8]    SoundHound Form 8-K (Jan. 3, 2024), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001840856/000121390024000804/ea190917 -8k_soundhoun.htm.

person." *McDonald's*, 580 F.Supp. 3d at 515. "Biometric information" refers to "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier." 740 ILCS 14/10.

17.     While BIPA does not define "voiceprint," courts have defined it as "data unique to an individual that could be used to identify someone." *Robinson v. Lake Ventures LLC*, No. 22-cv-6541, 2023 U.S. Dist. LEXIS 156296, at *17 (N.D. Ill. Sept. 5, 2023) (citation omitted); *see also Rivera v. Google Inc.*, 238 F.Supp. 3d 1088, 1096 (N.D. Ill. 2017) (defining voiceprint as "a set of measurements of a specified physical component," including "voice," that "can be used to identify" a person).

18.     "The physical characteristics of one's voice and the manner of speaking are unique to every person and are stable enough to be used for extremely reliable identification."[9] Further, "[b]ased on voice samples that became known (directly or indirectly) to belong to certain individuals . . . and that would be typically stored in a database, it is possible to identify those persons at any moment in the future on the basis of the person's voice, even if no other identifiers would be revealed."[10] As such, voice recognition and voice AI technology pose serious risks, "from violations of privacy to infringements on copyright law – with uses in criminal activity or fraudulent activity…."[11]

19.     BIPA requires that before a private entity can collect, capture, or otherwise obtain

---

[9] Oleksandr Pastukhov and Els Kindt, "Voice Recognition: Risks to Our Privacy," *Forbes* (Oct. 6, 2016), *available at* https://www.forbes.com/sites/realspin/2016/10/06/voice-recognition-every-single-day-every-word-you-say/?sh=6a3ce1af786d.

[10] *Id.* Indeed, "[f]orensic scientists may soon be able to glean more information from a mere recording of a person's voice than from most physical evidence." *Id.*

[11] "AI Voice Tech: What are the Privacy and Security Risks?," *Lexology* (June 21, 2023), *available at* https://www.lexology.com/library/detail.aspx?g=ad6dfe5c-a5e0-458a-bcff-63311942d8da.

an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics. 740 ILCS 14/15(b). The informed-consent requirement has been described by the Seventh Circuit as the "heart of BIPA," because it ensures that "consumers understand, before providing their biometric data, how that information will be used, who will have access to it, and for how long it will be retained." *Bryant*, 958 F.3d at 626.

20.    In addition, "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

21.    BIPA also requires that

[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

22.    BIPA provides a private cause of action for any person aggrieved by a violation of the statute, and allows recovery of $1,000 for negligent violations and $5,000 for intentional or reckless violations, as well as attorneys' fees and litigation expenses, and injunctive relief. 740 ILCS 14/20.

## II.    Defendants' Collection, Capture, Use, and/or Storage of Illinois Individuals' Biometric Identifiers and/or Biometric Information

23.    SYNQ3 offers a variety of technologies for automated ordering, including conversational AI voice ordering for restaurants and other establishments' to-go, delivery, and

drive-thru orders.  Since 2020, SYNQ3 has processed more than 70-million automated interactions across more than 10,000 restaurant locations.[12]

24.      SYNQ3 touts its Synq Voice technology as "the premier, AI-ordering technology for restaurants":

> Specifically developed for the restaurant industry, SYNQ Voice integrates with your current technology stack to support your guests through all phases of their ordering journey. From conversational interaction… to order management, capture, and submission… SYNQ Voice helps your restaurants maximize operational efficiencies, grow profitability, and engage with your guests like never before. [13]

25.      SYNQ3's voice AI platform utilizes a "[p]roprietary conversation management engine and features "[n]atural conversational flow" and a "[n]ative understanding of menu logic."[14] As explained by SYNQ3, "SYNQ Voice uses conversational AI, so your restaurant guests can speak naturally… just like they would with a real person."[15]  Further, it provides "human levels of understanding . . . ensuring your guests aren't just heard, they are understood."[16]  Indeed, SYNQ3 boasts the "highest-levels of understanding in the industry . . . which allows for unprecedented automation rates."[17]  "[U]nlike traditional automation services where guests must adapt to speak with technology, SYNQ3's conversational AI adapts to humans to create an effortless, and quality, guest experience."[18]

---

[12] https://synq3.com/ (last visited July 14, 2024).

[13] https://synq3.com/synq-voice/ (last visited July 14, 2024).

[14] https://synq3.com/synq-voice/ (last visited July 14, 2024).

[15] https://synq3.com/synq-voice/ (last visited July 14, 2024).

[16] https://synq3.com/ (last visited July 14, 2024).

[17] https://synq3.com/ (last visited July 14, 2024).

[18] https://synq3.com/big-pizza/ (last visited July 14, 2024).

26.    SYNQ3 "integrates with [its clients'] current technology stack,"[19] offering "automation that ties directly into [their] point-of-sale and continually updates menu and item availability…."[20] "[G]uests' orders are automatically processed and sent directly to [the] point-of-sale system for fast and accurate order-taking."[21] SYNQ3's technology also "integrates with the chain's rewards program, such that these call-in orders are linked with consumers' digital profiles."[22]

27.    The touted benefits of SYNQ3's voice AI technology, to both its clients and their customers, are many. First, the technology can "handle [ ] limitless concurrent calls and provide[] every guest with the time they deserve," thereby "[e]liminat[ing] missed orders because someone couldn't answer the phone or a guest hung up after hearing a busy signal."[23]

28.    Second, SYNQ3's technology "help[s] relieve the burdens of today's labor challenges": "With SYNQ3, you gain peace-of-mind knowing that you can worry less about staffing while ensuring that every possible order is captured."[24] Not only are staffing needs reduced, but existing staff are freed up to focus on other needs, such as food preparation, order fulfillment, and in-store service, which allows more orders to be processed during peak hours

---

[19] https://synq3.com/synq-voice/ (last visited July 14, 2024).

[20] https://synq3.com/ (last visited July 14, 2024).

[21] https://synq3.com/big-pizza/ (last visited July 14, 2024).

[22] "Casey's Rolls Out Voice AI as Convenience Stores Take on QSRs," *Pymnts* (Sept. 8, 2023), available at https://www.pymnts.com/news/artificial-intelligence/2023/caseys-rolls-out-voice-ai-convenience-stores-compete-qsrs/.

[23] https://synq3.com/fast-casual/ (last visited July 14, 2024).

[24] https://synq3.com/ (last visited July 14, 2024).

without the constant interruptions of staff having to answer phone calls.[25]

29.    SYNQ3's technology also claims to increase its clients' profits. "With our technology, guests are treated like VIPs and loyal, repeat customers are born—which drives incremental sales."[26] Customers' orders are also higher because the technology "effectively captures upsell opportunities that team members may forget about… or feel too rushed to even attempt."[27]

30.    SYNQ3 also claims that its technology is beneficial to consumers because it "radically enhances the guest experience" by promptly answering every call, taking orders efficiently and accurately, providing convenient reorder options, and processing orders in a natural, "effortless" conversational interaction.[28] It also "provide[s] unique, personalized interactions with returning guests."[29]

31.    At the end of 2022, Casey's "initiated a test with SYNQ3 to align with their three-year strategic plan to accelerate the off-premise food business and enhance operational efficiency."[30] Casey's CEO Darren Rebelez explained that Casey's was working on developing voice AI phone ordering for its phone system to "prevent call leakage and further boost

---

[25] https://synq3.com/big-pizza/ (last visited July 14, 2024).

[26] https://synq3.com/ (last visited July 14, 2024).

[27] https://synq3.com/fast-casual/ (last visited July 14, 2024).

[28] https://synq3.com/big-pizza/ (last visited July 14, 2024).

[29] https://synq3.com/synq-voice/ (last visited July 14, 2024).

[30] Press Release, "Casey's General Stores to Rollout SYNQ3 Restaurant Solution's Conversational AI Voice Ordering" (Sept. 6, 2023), *available at* https://www.pressrelease.com/news/caseys-general-stores-to-rollout-synq3-restaurant-solutions-22122317.

efficiency."[31]

32.    In a November 16, 2022, interview, Art Sebastian, Casey's Vice President of Digital Experiences, discussed Casey's implementation of voice AI for phone orders:

> The second area that we're launching AI is called voice AI. We have been working to train natural language processing (NLP) on how to take orders for pizza. But we still experience over 10 million telephone calls a year to order pizza. However, what we've seen is that we're missing phone calls because the phone's busy, because team members aren't answering – whatever it is, we're missing phone calls. And we've also seen that our phone call experience is inconsistent. We have 16 states where we have stores, we have 43,000 team members. There are so many variations of experiences you can have, so they're inconsistent. So as we install this voice AI, we will answer every phone call. Right off the bat, you see a sales increase, because we're capturing every call. That customer service experience is consistent because we're training the NLP to deliver that experience.[32]

33.    On June 27, 2023, at its 2023 Investor Day, Casey's announced its new three-year strategic plan, part of which includes "operational improvements that will drive efficiency and decrease costs" and "new digital store tools for team members and guests to improve speed and lower operating costs."[33]  Casey's highlighted how voice AI ordering was "enhancing operational efficiency" by "[s]ignificantly improv[ing] the ordering process during high volume time windows," and was improving the guest experience by providing a "[c]onsistent ordering experience" and "[p]ersonalized offers."[34]

---

[31] Jeff Wells, "Casey's Working to Automate Pizza Call-In Orders," *C-Store Dive* (Sept. 26, 2022), *available at* https://www.cstoredive.com/news/caseys-pizza-automating-phone-orders/632647/.

[32] Brett Dworski, "Q&A: The Mind Behind Casey's Digital Transformation Efforts," *C-Store Dive* (Nov. 16, 2022), *available at* https://www.cstoredive.com/news/caseys-digital-transformation-art-sebastian-interview/636695/.

[33] Press Release, "Casey's Announces New Three-Year Strategic Plan" (June 28, 2023), *available at* https://www.businesswire.com/news/home/20230628081960/en/Casey%E2%80%99s-Announces-New-Three-Year-Strategic-Plan.

[34] Casey's 2023 Investor Day Presentation (June 27, 2023) at 71, 74, *available at* https://s2.q4cdn.com/194594550/files/doc_presentations/2023/06/2023-06-23_final_casey-s-2023-investor-day-deck.pdf.

34.    To that end, after a successful trial, on September 6, 2023, Casey's announced that it was rolling out SYNQ3's technology for phone orders across its stores. In making the announcement, Casey's Chief Information Officer, Sanjeev Satturu, stated: "We are excited to partner with SYNQ3 to give our team members more time to focus on our guests and operating our stores. We are committed to reducing friction on our guests and team members by leveraging technology to simply and streamline the ordering experience."[35]

35.    SYNQ3's voice AI technology is now being utilized at Casey's locations across the United States, including locations in Illinois. Based on the investigation of Plaintiffs' counsel, SYNQ3's voice AI technology is being used by at least 162 Casey's locations in Illinois.

36.    Unbeknownst to Illinois customers, through the use of SYNQ3's voice AI technology, Defendants are collecting, capturing, otherwise obtaining, using, and/or storing customers' voiceprints, biometric identifiers, and/or biometric information in order to analyze, understand, interpret, and/or use their speech signals; to help improve the accuracy and effectiveness of SYNQ3's voice AI technology; to compile customer-specific data and/or identify specific customers; and to facilitate reordering and upselling.

37.    This is clear from SYNQ3's descriptions of its own technology.  For example, with respect to SYNQ3's collection of voiceprint data, SYNQ3 CEO Steve Bigari stated. "The actual restaurant-function of our technology, taking orders, only scratches the surface of its abilities. ***The data we're collecting from servicing 10,000-plus, digital, voice-engagement orders per day is incredible and will continue to provide revolutionary insights into the guest experience and***

---

[35] Press Release, "Casey's General Stores to Roll Out SYNQ3 Restaurant Solution's Conversational    AI    Voice    Ordering"    (Sept.    6,    2023),    *available    at* https://www.accesswire.com/780864/caseys-general-stores-to-rollout-synq3-restaurant-solutions-conversational-ai-voice-ordering.

*restaurant offerings with time*."[36]

38.     And in announcing the merger with SYNQ3, SoundHound stated that one of the "immediate business benefits" were "[e]nhanced AI models using *data from over 50 million interactions* to strengthen product performance."[37] Similarly, Mr. Bigari stated with respect to the merger:  "Together, we plan to capitalize on those synergies to provide best in-class AI ordering methodologies backed by the *largest library of restaurant AI orders in the world*."[38]

39.     Defendants have not informed individuals in writing that their biometric identifiers or biometric information is being collected, captured, or otherwise obtained, nor have they informed customers of the purpose or length of time for which such information is being collected, stored, or used. 740 ILCS 14/15(b).

40.     Defendants have not received written releases executed by individuals whose biometric identifiers and/or biometric information is being collected, stored, or used.

41.     Defendants do not have publicly available, written policies regarding the retention or permanent destruction of the biometric identifiers or biometric information that they possess, "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first," as required by BIPA. 740 ILCS 14/15(a).

---

[36]     https://www.fsrmagazine.com/industry-news/takeout-technology-processes-1-billion-65-months/ (emphasis added).

[37]   https://www.soundhound.com/newsroom/press-releases/soundhound-ai-to-acquire-synq3-to-expand-its-ai-customer-service-solutions-and-create-the-largest-voice-ai-provider-for-restaurants/#:~:text=SANTA%20CLARA%2C%20Calif.%2C%20December,solutions%20to%20the%20restaurant%20industry (emphasis added).

[38]  Eric Hal Schwartz, "SoundHound AI Acquires Restaurant Voice AI Startup SYNQ3," voice.bot.ai (Dec. 11, 2023), *available at* https://voicebot.ai/2023/12/11/soundhound-ai-acquires-restaurant-voice-ai-startup-synq3/ (emphasis added).

42.     Upon information and belief, Defendants are retaining Plaintiffs' and other similarly situated individuals' biometric identifiers and/or biometric information beyond the time limits set by BIPA.[39]

### III.    Plaintiffs' Experiences

Plaintiff Danielle Connor

43.     Over the course of the past three years, Ms. Connor has called the Casey's location at 304 W. Clinton Street, Rushville, Illinois, at least a dozen times. Ms. Connor's most recent call to Casey's was in March, 2024. During the calls, Ms. Connor interacted with a voice AI assistant who took her order and collected certain personal information from her, depending on the type of order. For orders that were to be picked up from the store, the voice AI assistant took Ms. Connor's first and last name and telephone number, and for orders that were to be delivered, the voice AI assistant took Ms. Connor's full name, phone number, and address.  Ms. Connor typically paid for her orders with a debit card, although on occasion she has paid with cash or with a Casey's gift card.

44.     Upon information or belief, the voice AI technology utilized for taking Ms. Connor's orders collected, captured, used, and/or stored her unique voiceprint, biometric identifiers, and/or biometric information.

45.     At no time before or during the calls was Ms. Connor ever informed (much less in writing), that her biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

---

[39] There is no mention of any such policy on the Casey's corporate website. https://www.caseys.com/privacy-policy (last visited July 14, 2024) or the SoundHound website. https://www.soundhound.com/privacy-policy/ (last visited July 14, 2024). And the only section of SYNQ3's privacy policy relating to biometrics is for California residents. https://synq3.com/privacy-policy/ (last visited July 14, 2024).

46.     Nor did Ms. Connor ever provide a written release authorizing the collection, use, or storage of her biometric identifiers or biometric information.

Plaintiff Kristin Schmitz

47.     Over the course of the past five years, Ms. Schmitz has called the Casey's location at 710 W. Broadway Street, Sparta, Illinois, approximately once every few months. Her most recent call to Casey's was on June 3, 2024. During the calls, Ms. Schmitz interacted with a voice AI assistant who took her order and collected certain personal information from her – specifically, her first and last name. Ms. Schmitz always picks up her orders from the store and pays with a debit card.

48.     Upon information or belief, the voice AI technology utilized for taking Ms. Schmitz's orders collected, captured, used, and/or stored her unique voiceprint, biometric identifiers, and/or biometric information.

49.     At no time before or during the calls was Ms. Schmitz ever informed (much less in writing), that her biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

50.     Nor did Ms. Schmitz ever provide a written release authorizing the collection, use, or storage of her biometric identifiers or biometric information.

## CLASS ALLEGATIONS

51.     **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of a class of similarly-situated individuals, defined as follows (the "Class"):

> All individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored by Defendants when making a telephone order at a Casey's location in the State of Illinois at any time within the applicable statute of limitations.

52.     **Excluded** from the Class are Defendants; Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which Defendants or their parents has a controlling interest (as well as current or former employees, officers and directors); Plaintiffs' counsel and Defendants' counsel; and the legal representatives, successors, and assigns of any such excluded persons.

53.    **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe there are many thousands of persons in the proposed Class.

1.    **Commonality and Predominance**:  Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members. Common questions of law and fact include:

a.    Whether Defendants collected, captured, or otherwise obtained biometric identifiers and/or biometric information from Plaintiffs and the Class;

b.    Whether Defendants stored Plaintiffs and the Class's biometric identifiers and/or biometric information;

c.    Whether Defendants used Plaintiffs and the Class's biometric identifiers and/or biometric information;

d.    Whether Defendants informed Plaintiffs and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, or used, and, if so, for what purpose and length of time;

e.    Whether Defendants obtained a written release executed by Plaintiffs and the Class before capturing, collecting, or otherwise obtaining their biometric identifiers and/or biometric information;

f.  Whether Defendants maintained a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and/or biometric information;

g.  Whether Defendants retained Plaintiffs and the Class's biometric identifiers and/or biometric information beyond the time limits set by BIPA;

h.  Whether Defendants used Plaintiffs and the Class's biometric identifiers and/or biometric information to identify them;

i.  Whether Defendants profited from Plaintiffs and the Class's biometric identifiers and/or biometric information;

j.  Whether Defendants' conduct has violated BIPA;

k.  Whether Defendants' BIPA violations were committed intentionally, recklessly, or negligently; and

l.  Whether Plaintiffs and the Class are entitled to damages and injunctive relief.

54.  **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiffs and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein.

55.  **Fair and Adequate Representation**: Plaintiffs will fairly and adequately represent the interests of the members of the Class and have no interests antagonistic to or in conflict with those of the Class. Plaintiffs' claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiffs and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein. Further, Plaintiffs have retained qualified counsel with substantial experience in prosecuting

complex litigation and class actions nationwide.

56.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**
**Against All Defendants**

57.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

58.    Defendants are private entities under BIPA.

59.    BIPA requires that "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

60.    SYNQ3's voice AI technology has been utilized for telephone orders at various Casey's locations in Illinois. Through use of this technology, Defendants captured Illinois customers' voiceprints, which were stored on Casey's servers, computer or telephone system, and/or point-of-sale system, and were also stored on SYNQ3's servers and/or computer system. As such, Defendants possessed, and exercised control over, Plaintiffs and the other Class

members' biometric identifiers and/or biometric information.

61.    Defendants do not have publicly available, written policies regarding the retention or permanent destruction of the biometric identifiers or biometric information that they possess, as required by BIPA.

62.    Upon information and belief, Defendants are retaining Plaintiffs and other similarly situated individuals' biometric identifiers and/or biometric information beyond the time limits set by BIPA.

63.    Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**
**Against All Defendants**

64.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

65.    Defendants are private entities under BIPA.

66.    BIPA requires that before a private entity can collect, capture, or otherwise obtain an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics.  740 ILCS 14/15/(b).

67.    SYNQ3's voice AI technology has been utilized for telephone orders at various Casey's locations in Illinois. Through use of this technology, Defendants collected, captured, or otherwise obtained Illinois customers' voiceprints, which were stored on Casey's servers,

computer or telephone system, and/or point-of-sale system, and were also stored on SYNQ3's servers and/or computer system.

68.    Defendants failed to inform Plaintiffs and the other Class members in writing, in advance, that their biometric identifiers and/or biometric information was being collected or stored, as required by 740 ILCS 14/15(b)(1).

69.    Defendants failed to inform Plaintiffs and the other Class members in writing of the specific purpose and length of term for which their biometric identifiers and/or biometric information is being collected, stored, and used, as required by ILCS 14/15(b)(2).

70.    Defendants failed to obtain a written release from Plaintiffs, the other Class members, or their authorized representatives, as required by 740 ILCS 14/15(b)(3). As such, Plaintiffs and the other Class members' privacy rights and privacy interests in their biometric identifiers and/or biometric information have been violated.

71.    Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

### THIRD CAUSE OF ACTION
### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)
### Against Defendants SYNQ3 and SoundHound

72.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

73.    SYNQ3 and SoundHound are private entities under BIPA.

74.    BIPA provides that "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information."  740 ILCS 14/15(c).

75.     Through their use of voice AI technology for telephone orders at Casey's locations in Illinois, Defendants possessed, and exercised control over, Plaintiffs and the other Class members' biometric identifiers and/or biometric information.

76.     SYNQ3 and SoundHound profited from Plaintiffs and the other Class members' biometric identifiers and/or biometric information by, *inter alia*, using them to improve its voice AI technology, increase sales of the technology, and gain an edge over its competitors.

77.     As a result, Plaintiffs and the other Class members have been injured by Defendants' conduct, including through the unknowing loss of control of their unique biometric identifiers and/or biometric information and violation of their rights in, ownership of, and right to profit from, their unique biometric identifiers and/or biometric information.

78.     Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court enter an order as follows:

a.  Certifying the Class as defined above, appointing Plaintiffs as Class Representatives, and appointing the undersigned as Class Counsel;

b.  Declaring that Defendants' actions, as set forth herein, violate BIPA;

c.  Awarding injunctive and equitable relief as necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with BIPA;

d.  Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA;

e.  Awarding statutory damages of $1,000 for each negligent violation of BIPA;

f.  Awarding Plaintiffs and the Class their reasonable litigation expenses and attorney's fees and costs;

g.  Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

h.  Awarding such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all claims that can be so tried.

Dated: August 2, 2024                    Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ J. Ryan Lopatka*
J. Ryan Lopatka (Bar Number 6303849)
161 N. Clark St., Suite 1700
Chicago, IL 60601
Telephone: (312) 759-9700
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

Kim E. Miller
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

Lewis S. Kahn
Melissa H. Harris
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com

-and-

**DON BIVENS, PLLC**
Don Bivens
Teresita Mercado
15169 N. Scottsdale Road
Suite 205
Scottsdale, Arizona 85254
don@donbivens.com
teresita@donbivens.com
602-708-1450

*Counsel for Plaintiffs and the Putative Class*